**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **REBECCA CARROLL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **2:12-cv-1114** |
| **v.** | ) |
| | ) |
| **ACME TRUCK LINE, INC.,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

<u>**MEMORANDUM OPINION**</u>

Pending before the Court is DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

(ECF No. 29), along with a brief and concise statement of material facts filed pursuant to Local

Rule 56(B)(1) ("CSMF") (ECF Nos. 30, 31). Rebecca Carroll ("Plaintiff") filed a brief in

opposition (ECF No. 40), and Acme filed a reply (ECF No. 44). Accordingly, the matter is ripe

for disposition.

## I. BACKGROUND

**A. Fact**s[1]

Defendant, Acme Truck Line, Inc. ("Acme"), is a Louisiana-based trucking company that

_____

1.      As an initial matter, Acme requests that, in accordance with Local Rule 56(E), the Court deem admitted all of the facts in its CSMF because Plaintiff has failed to file a responsive CSMF. It is true that Plaintiff did not comply with her obligation under Local Rule 56(C)(1) to specifically respond to each numbered paragraph in Acme's CSMF. She did, however, include an extensive factual summary in her brief, with citations to the record. She also attached voluminous exhibits to her brief, including the complete transcriptions of the depositions of Plaintiff, Jimmy Patsfield, and Mark Roelser. Through these filings, Plaintiff has disputed many of the facts in Acme's CSMF. Accordingly, while the Court admonishes Plaintiff for her failure to comply with the Local Rules, it finds that it would be inappropriate to deem all of Acme's averments admitted. As Chief Judge Conti has explained under similar though not identical circumstances, it is "within the court's discretion to direct different procedures as the circumstances require. This approach permits the court to take stock of the 'entire setting' of the case when ruling on summary judgment." _Hickenbottom v. Nassan_, No. 03–223, 2007 WL 7753803, at *6 (W.D. Pa. March 29, 2007) (citations omitted).

1

operates terminals throughout the country, including one in Uniontown, Pa. (the "Penn South Terminal"), which services businesses in the Marcellus shale industry. In June 2011, Plaintiff, a longtime veteran of the trucking industry, was recruited to work at the Uniontown terminal by its then-manager, Jimmy Patsfield ("Patsfield"). Plaintiff and Patsfield had known each other for about three or four months prior to that, having met while Plaintiff was attempting to recruit Patsfield to work for her former employer, a rival trucking company called United Vision Logistics. In those few months, they had a good business relationship and "talked a lot," often via text messages, about a range of topics, both personal and professional.[2]

Mark Roesler ("Roesler"), an Acme vice president who worked out of the company's headquarters in Louisiana but was in charge of its mid-Atlantic operations, hired Plaintiff to work in a business development role in mid-July 2011. On July 18, after learning that Plaintiff had been hired, Patstfield texted her, "Woo hoo, sign the sexual harassment [policy] as I guess you are my new boss lol."[3] Plaintiff responded, "Lol." Plaintiff officially started work on July 25. Her job was essentially to recruit other terminals, trucks, and drivers to do business with Acme. Furthermore, although Patsfield retained his title as terminal manager, he began to report to Plaintiff once she came onboard.

Plaintiff's good relationship with Patsfield continued after she joined Acme's ranks. The two continued to exchange text messages on a regular basis, and these messages had a similar

---

2.      Acme has attached as an exhibit to its CSMF all of the text messages sent between Plaintiff and Patsfield from June until September 2011. *See* Def.'s CSMF, Ex. B, Parts 1-3 (ECF No. 31). The Court has reviewed all of the text messages and finds that they provide invaluable context to understanding the background of Plaintiff's claims. In the interest of conserving space, however, the Court will not reproduce them *in toto*. Instead, only those messages that are directly relevant to Plaintiff's claims.

3.      The term "lol" means "laughing out loud" or "laugh out loud." It is used in electronic communication to express amusement.

tone to those exchanged before Plaintiff started working for Acme – a mix of business discussions and personal banter.

Because of Plaintiff's job duties, she only worked out of the terminal approximately five times during her approximately three-month tenure with Acme. The rest of her time was spent on the road dealing with prospective customers. Sometime in late August, Gaye Martz ("Martz"), an administrative employee at the terminal whom Plaintiff had encouraged Patsfield to hire, posted a picture of Plaintiff as the screensaver on all of the terminal's computers, apparently as a joke about Plaintiff's regular absence from the office. Plaintiff claims that she eventually complained about the picture because she thought it was inappropriate, and everyone in the office except Patsfield removed it from their computers. Several of the messages that now form the basis of Plaintiff's hostile work environment claim revolved around this incident. For example, on August 30, Patsfield texted Plaintiff, "Can't seem to break myself away from all your beautiful pictures on my two screens." Plaintiff responded, "Wow, that explains it . . . . Hope I don't find any dart or bullet holes in them anytime soon!" Patsfield then wrote back, "Nah you don't have to worry about that I've already asked [Roesler] for a couple more. So I can completely surround myself with Becky Carroll." Then, on September 7, Patsfield texted Plaintiff, "Good morning! How's my favorite screensaver?" Plaintiff responded, "Good thanks, how are you?"

In mid-September, Plaintiff attended a two-day training at Acme's corporate headquarters in New Orleans. While she was away, she and Patsfield exchanged numerous text messages. Several times, Patsfield requested that Plaintiff send her pictures of her "sucking the heads" of steamed catfish – a common practice in Louisiana. Other texts were more mundane. At one point, for instance, Plaintiff told Patsfield that she had left her convertible uncovered in the

airport parking lot.  In response, Patsfield and another person went to the airport and made sure that Plaintiff's car was covered in advance of an impending rainstorm.

Upon Plaintiff's return to Pennsylvania, however, her relationship with Patsfield started to deteriorate. A number of factors coalesced to cause the problems.   According to Roesler, Plaintiff and Patsfield were involved in a disagreement over how to handle a particular customer. A string of text messages between them on September 19, 2011, reveals that underlying tension about their respective roles at the terminal had also begun to surface.

As Patsfield testified in his deposition, in these texts, "[Plaintiff] was like telling me what to do.  She was trying to assert her authority with me."  The text conversation ended with Plaintiff saying, "And whatever you are taking, you may want to lay off it" – a comment Patsfield apparently did not appreciate.  Plaintiff and Patsfield also exchanged several phone calls during which Patsfield raised his voice at Plaintiff.

As Plaintiff described it, up until this point, her relationship with Patsfield was cordial, but "then he exploded."  She started to observe him engage in what she considered to be erratic behavior, and felt that the misconduct that Patsfield had previously directed to Martz was now being directed to her because she stood behind some of Martz's complaints about how the terminal was being managed.  Plaintiff also testified that after returning from New Orleans, where she had received information regarding sexual harassment as part of her training, she started to see some of Patsfield's conduct in a different light.  At one point – either on September 22 or 23 – Plaintiff "was in the ladies room" and "Patsfield was pounding on the door trying to get in.  He was wringing his hands.  He was yelling at other people.  He was swearing at me," yelling "[l]ady, you better find another f---ing terminal to work out of, because you are not

welcome here."[4] Patsfield's conduct allegedly made Plaintiff fear for her safety. As she testified, "409 pounds versus 125 [pound] when he is in your face screaming at you that you can feel his spit, you would feel scared." Patsfield also allegedly started to accuse Plaintiff and Mike Stringfellow, a business associate of Plaintiff's, of trying to take over Acme's business in the region.

At the same time, a number of other incidents were causing upheaval in the terminal. In particular, Patsfield started to have problems with Martz, the administrative worker who Plaintiff had helped to hire. In Patsfield's view, the problems arose because Martz was being insubordinate, reporting to Plaintiff when she should have been reporting to him. Within weeks of starting at Acme on August 8, Martz had gotten into spats with Patsfield's daughter, Dakota, who did not work for Acme but hung around the terminal, and Brad Sciullo ("Sciullo"), the terminal's dispatcher. The latter incident drove Martz to walk out of the terminal in anger, though things were eventually smoothed over and Martz eventually returned to work. After that, however, her relationship with Patsfield only worse. The tipping point came on September 21, after Martz moved a driver off a load and replaced him with a different driver without first seeking Patsfield's permission, which Patsfield testified was required before a new driver could take a load for Acme. Martz's decision sent Patsfield into an obscenity-laden outburst, after which Martz walked out of the terminal for a second time in fear for her safety. She never returned to work after this incident.

The next day, Martz sent Roesler an e-mail in which she outlined some of the issues that had been brewing at the terminal and inquired into her status with the company. In the e-mail,

_____

4. Plaintiff testified that Patsfield made the same comment to her on another occasion while she was on the road with a potential customer, Scott Carr. This apparently took place the day before the incident in the terminal, though Plaintiff's testimony is far from clear on this point.

Martz complained that the terminal was in a "general state of disarray": trash was overflowing, the bathroom was unclean, the refrigerator was dirty and filled with rotting food. There was also a "torn up old lazy boy" sitting in the center of the office, on which Patsfield slept at night since he was living there at the time. Martz wrote that on one occasion she walked in on Patsfield sleeping in the "chair, in his underwear, exposed." In addition to describing the general conditions of the terminal, Martz complained that employees were often drinking on the job and that Patsfield and others engaged in and condoned violations of Acme policies and Pennsylvania Department of Transportation regulations. A day later, Martz followed up on her complaint by e-mailing Roesler five pictures that depicted the conditions in the terminal and claiming that she was working in a "hostile work environment." Martz forwarded the pictures to Plaintiff – one of a series of e-mails between the two regarding Martz's complaint and Roesler's response thereto. Eventually, Roesler e-mailed the pictures to Patsfield and admonished him that his "office should NEVER look like this and I am disappointed. Please make the necessary changes so that our office is always presentable and professional."

Kimberly Foster ("Foster"), Acme's chief financial officer ("CFO") and head of human resources, had also reviewed Martz's e-mail. Late on September 23, she sent Roesler an e-mail telling him that they would discuss Martz's complaint the following week. Roesler responded, "I'm pissed off about this mess but ok. Talk to you on Monday." Foster then e-mailed back, "As I suspected! They have all put you and Acme in a bad situation." Closing on the string of e-mails, Roesler wrote, "I can be there Monday if you think I need to."

That same night, in response to the growing turmoil in the terminal, Plaintiff sent an e-mail to Roesler with the subject line "Solutions." The e-mail explained that Plaintiff planned to submit a plan for moving forward with the Uniontown terminal and Acme's Pennsylvania

operations, generally. She also indicated that she would like to find a way to keep Martz employed with Acme. Roesler responded later that day, saying that he was "disappointed . . . in both [Plaintiff] and [Patsfield] for not getting with [him] on these issues before it was this far out of control." Furthermore, Roesler wrote that he was unsure whether it was possible to keep Martz employed with Acme since Patsfield would not work with her and he did not have an opening in another terminal. He concluded the e-mail by re-affirming his support for Patsfield, while noting that both Patsfield and Plaintiff had to improve their management skills:

> I know Jimmy isn't perfect but I believe in him and he has done a great job for us to this point. Is there room for improvement? Yes and he will improve. Right now, in my mind, both of you have room for improvement. This entire fiasco has been a mess and handled badly by both of you.

On September 24, Plaintiff and Roesler exchanged a series of e-mails about Plaintiff's proposed plan, which Plaintiff had yet to submit. In one of the e-mails, Plaintiff asked Roesler whether he and Patsfield were related – apparently insinuating that there had to be some explanation for Roesler's continued support for Patsfield. Roesler responded that he and Patsfield were not related, and then forwarded Plaintiff's e-mail to Foster. After Foster asked Roesler where Plaintiff's out-of-the-blue question came from, he responded, "Good question. She needs to tread lightly here. I am extremely close to my limit with this crap."

On September 25, prior to sending her proposed solutions, Plaintiff sent Roesler an e-mail commenting on the conditions in the terminal, largely echoing the sentiments expressed in Martz's e-mail. *Id.* Plaintiff explained that any time she tried to raise an issue with Patsfield, he became enraged. She also claimed that Pastfield was spreading rumors about her to a customer. Finally, the e-mail included the following allegations regarding sexual harassment:

> Jimmy became discouraged with me because I would not be part of things that didn't involve work. He made remarks to me that [could] certainly be called 'sexual harassment.' Commenting on my clothing, patting his knee and raising his

eyebrows suggesting I sit on his lap. Saying, 'you better NOT take a significant other to San Francisco'. . . , to mention a few. I always answered calls and tex's [sic] by changing the subject to work related issues. ex: he would make a comment, I would ask him about how many loads we moved that day. (one of the reasons I was being persistent to get my reports on the Acme web, so I would have this information) I don't want to do anything about this. I simply want it to stop. However, I do think this will cause me problems. Jimmy shows an unhealthy way of taking revenge on people.

Upon his receipt of Plaintiff's e-mail, Roesler forwarded it to Foster with the note, "More of the same rock throwing; no plan yet."

Shortly after sending her e-mail regarding the conditions at the terminal, Plaintiff finally sent Roesler her planned solutions. Within an hour of e-mailing Roesler, Plaintiff followed up with an addendum to her original suggestions. In this e-mail, Plaintiff asked Roesler about the terminal's expenses and suggested that Patsfield be terminated as an Acme employee and turned into a commission agent. She also told Roesler that she was concerned about her safety as a result of Patsfield's behavior and that she had received anonymous prank phone calls and e-mails originating from the Uniontown terminal. When Roesler received the second e-mail, he forwarded it to Foster, adding, "She's got nerve."

Unbeknownst to Plaintiff, while these e-mails were going back and forth, Roesler was already planning to fly to Uniontown to attempt to personally resolve the ongoing issues. Roesler testified that the trip was intended to address some of the issues raised in Martz's e-mail, along with the other issues that had arisen, but was not specifically intended to address Plaintiff's claim of harassment. Roesler told Patsfield about his plan to be in Uniontown on September 24 during an hour-long discussion about the situation at the terminal. At the end of this conversation, for unstated reasons, Patsfield offered to resign. Roesler did not accept Patsfield's offer, but instead told him to "stop being a baby" and that he "would guide him through it and we will make some needed changes." While Roesler told Patsfield about the meeting on Septmeber

24, he did not tell Plaintiff about it until late the next evening after he had already arrived in Pennsylvania.

The meeting between Plaintiff, Roesler, and Patsfield took place the next morning. By all accounts, Roesler and Patsfield did most of the talking. Plaintiff testified that she sat in silence and listened as the two men talked. During the meeting, Patsfield made clear that he did not want to work with Plaintiff, but Roesler's position was that she could not be terminated at that time. Both Plaintiff and Roesler testified that Patsfield raised his voice to Plaintiff throughout the meeting. Patsfield did not dispute that he spoke loudly. After the meeting, the three went out to lunch together.

Two days after the meeting, Roesler e-mailed Plaintiff and Patsfield a summary of the issues that were discussed, which he indicated could be used as a guide and reminder as they moved forward in their working relationship. According to the e-mail: (1) there would be a team meeting each Monday morning; (2) going forward, Plaintiff would have to provide an itinerary to Roesler each week with her plans for that week; (3) Plaintiff would continue to conduct sales and truck recruiting for the Uniontown terminal and develop additional terminals in the Marcellus Shale area; (4) new terminals would report to Roesler and once a terminal signed on with Acme, Plaintiff's duties with it would end; (5) Patsfield would continue to build and grow the Uniontown terminal but he was also required to hire and develop good people and foster a good working environment, which would involve Patsfield and Plaintiff working together with mutual respect; (6) both Plaintiff and Patsfield would work directly for Roesler and not for each other; (7) Plaintiff and Patsfield would communicate with each other when issues developed in a professional manner and report any disagreements to Roesler immediately; and (8) no text messaging would be permitted between Patsfield and Plaintiff and the terminal and Plaintiff.

According to the e-mail, Plaintiff had also indicated at the meeting that "there wasn't a physical threat from [Patsfield] and both feel they can work together going forward." Moreover, Roesler wrote that they had decided to let Martz's "walk out" stand, though she would be given two weeks' severance pay. Plaintiff disputes that the meeting went as described in Roesler's memo.[5]

On September 29, Plaintiff received a phone call from Foster at the corporate office following up on the meeting with Roesler.[6] While Plaintiff testified that she disagreed with Roesler's summary of the meeting, during the call, she seemed to agree with Foster that the meeting had gone well:

> Foster: I've talked to Mark many times over the last few days, you know with the situation at the terminal, you know in between you and Jimmy and just kind of wanted to follow-up on that team meeting and you know kind of review the emails that Mark because he forwarded me everything, and I kind of went through them and honestly believe based on his summary, that he did a good job trying to set the expectations uh for you guys and kind of help you move forward with those issues and hoping you know, that you guys all feel the same way . . . because you seem to have a good plan going forward . . .
>
> Plaintiff: Right, and I do, after Mark's um son's wedding and I want to talk to him a little bit about tweaking it because the only thing that I would like for him, and it will take him getting a little bit of faith

---

5. Roesler asked Patsfield to purchase a tape recorder prior to the meeting, and the meeting was supposed to have been recorded. When Plaintiff asked for a copy of the tape, however, her request was denied and she was never provided with a reason why. According to Roesler's testimony, he determined after the meeting that he had inadvertently pushed the "play" button on the recorder instead of the "play/record" button. He testified that he did not inform either Patsfield or Plaintiff that the tape was not recorded because he wanted them to believe that it was, in fact, recorded. Plaintiff insinuates that the tape was not turned over for improper reasons, but does not provide any factual basis for her speculation. Nor has she directly made a spoliation of evidence argument. In any event, it is not actually disputed that Patsfield raised his voice at the meeting and acted aggressively toward Plaintiff. In the Court's view, Plaintiff's real point of contention is what Roesler decided to do as a result of what was discussed at the meeting.

6. The call was recorded, and a copy of both the recording and a transcript were attached to Acme's CSMF. *See* Def.'s CSMF, Ex. A (ECF No. 31-2).

in me, but um once I open an agency or an office or a terminal I do want to try to keep contact with them because a lot of their success is having a local rep call on them.

Foster:          Uh, huh . . .

Plaintiff:        . . . so I wanted to talk to him about that but I felt that was just miniscule and I just, I've been doing this for 34 years and I did it for Land Star and I used to always make sure all my terminals talked to each other and it was just such an important part of being a team and getting everybody used to each other so I'm hoping that um that he'll understand that and maybe once he gets up here and meets everybody he'll feel a little more comfortable with it too.

Foster:          Yeah, and everybody seems to really have nice things to say about each other um you know, Jimmy's complimented you uh very nicely and so I think you guys, I'm hoping you guys will be able to get through, get past all of this and you know it's always a learning curve when new people, you know new companies and everything…but I really just wanted to take a minute just to make sure that everybody had the opportunity to get their you know their issues in front of Mark so that he could get the chance to make sure they were addressed well.

Plaintiff:        Oh yeah, oh yeah, it was and um like I said that was just the one little thing and I just know from past experience if an agency has a problem, or I called them agencies, I call them a terminal, if the terminal has a problem they want a local rep they can go to who comes in and fixes it whether it be a billing problem or a policy problem and I don't want to lose that touch with these guys. . . but again, once Mark, I think once Mark gets to know me a little bit better and when he sees the network that I can bring in and weave in together I think that will be um he'll feel a little better about it (laughter) . . . I didn't want to throw that out at him right when he is having his son's wedding you know?

Several hours after the phone call with Foster, at 10:30 p.m. EST (9:30 p.m. CT), Plaintiff e-mailed Roesler the following message which allegedly set in motion her eventual termination: "We need to talk on Monday. Mike Stringfellow would like to meet you asap. Please don't jeopardize my safety. **Jimmy has been out on a truck all day . . . . and drinking . . .**" She forwarded the same e-mail to Coatney and Foster. Plaintiff's allegation set off a flurry

of e-mails the next day between her and Roesler:

Roesler (9:06 a.m.):    Becky, Where did you get this info? What facts do you know?

Plaintiff (9:13 a.m.):  Picked up in a mf [mini-float] at Baker Hughes is what was relayed to me . . .  It is my understanding this happens regularly.

Roesler (9:15 a.m.):    Who is the source of this info? Was Jimmy driving the m/f?

Plaintiff (9:18 a.m.):   The customer does not want involved . . . . But I can get written statements if I have to . . . .  I really just want to work and do my job. This is unfair to Acme and all concerned.

Plaintiff (9:21 a.m.):   Were you made aware of the prank phone calls to Halliburton two nites [sic] ago? Originating from Brandon Calloway's phone? I don't like this. After [he] fired his driver?

Roesler (9:23 a.m.):    Becky, I want the name of the person that gave you this info. I don't care if they want to be involved or not, they are involved. I also do not need you to get any statements, I can conduct my own investigation. Please provide the info requested.

Roesler (9:25 a.m.):    Again, who is the source of this new info?

Plaintiff (9:33 a.m.):   Mark, this was given to me in confidence. I need to speak with the customer. I do not want to jeopardized [sic] the acct. I will be back with you in a short while.

Roesler (9:39 a.m.):    Becky, Unacceptable, as your employer I am asking for information from you to support your accusation. Apparently the account is already at risk and that is the least of my concern at this point. Again, provide me the info I have requested.

Roesler (10:18 a.m.): Becky, I sent the email below over half an hour ago? This is my third request. Please provide the info requested.

Plaintiff (10:36 a.m.): (e-mail contained no content).

Roesler (1:36 p.m.):    Becky, I have requested information from you 3 times today regarding the email about Jimmy that you sent last night. Understand that if there is a problem or conduct in violation of Acme policy it is my obligation to investigate and your obligation to provide the information that you say you have so that I can thoroughly investigate. By choosing not to provide the information, subjects you to termination.

Plaintiff (1:36 p.m.): There is no wireless phone reception in Stringfellow office, I had to reset the connection out in the parking lot. The call came from the customer asking if I was going to start driving too. I asked what he meant. I do not have any access to emails right now. Sending this from my [blackberry].

Plaintiff (1:48 p.m.): I am not withholding information. Wanted to protect Acme. I do not understand being able to discuss this with the customer. Felt as if I were doing damage control as I did with Halliburton.

Roesler (2:03 p.m.): Becky, Yes you are withholding information. You have yet to provide me with the persons [sic] name that gave you this information. Go home for the weekend and I will get back to you on Monday.

Roesler sent Plaintiff another e-mail the following Monday, October 3, and Plaintiff again refused to comply with his request. When asked at her deposition for the name of the person who purportedly provided her the information, Plaintiff responded, "[I]t was the guy that was loading the truck, I believe his name was Mark or – his name could have been Josh. I don't know . . . I actually, I don't know what his name was, and maybe it was Jason. I don't know."

On the same date that Plaintiff e-mailed Roesler the allegation, she was exchanging text messages with Martz. At one point during this exchange, at 3:47 p.m., Plaintiff sent a message saying, "Betcha [Patsfield] is out on a truck." Approximately six hours later (or thirty minutes before she e-mailed her allegation to Roesler), she sent the following message to Martz: "Jimmy was out on a truck today, took two loads for [Baker Hughes] in brandon's truck, trying to figure out how to expose this." Then at 10:31 p.m., she texted Martz, "I just sent a [message] to [Roesler] and told him not to jeopardize my safety but [Platsfield] was in brandon's truck and drinking, sending it to Coatney." The next morning, at the same time Roesler was requesting that Plaintiff turn over information related to the allegation, Plaintiff texted Martz: "Mark is defending [Patsfield] . . . . Again. Unreal."

Meanwhile, at 7:54 a.m. on September 30, Coatney sent Roesler an e-mail advising him

that Patsfield should be required to undergo drug and alcohol testing that morning and again a few days later. At 8:56 a.m. – before the e-mail exchange between Plaintiff and Roesler regarding the allegation – Roesler responded to Coatney, "[Q]uite frankly I am very fed up with [Plaintiff]. Where did she get her info? She is giving NO facts, just throwing things out until something sticks. She is working very hard to destroy a man that has worked hard for Acme, why?" Then, at 9:28 a.m., Roesler sent Coatney another e-mail saying, "[A]t this point even if [Patsfield] tests positive for every drug known to man, I cannot work with [Plaintiff] going forward. I believe she is nothing more than a cancer. This is out of control." Coatney responded at 9:30 a.m.: "I agree that she should be terminated but we have to follow up any potential problems. Kimberly [Foster] will order the tests." According to Patsfield's deposition, Roesler contacted him around this same time to discuss Plaintiff's termination. Patsfield testified that he got the impression that Roesler wanted to terminate Plaintiff even before she e-mailed her allegation and that the allegation was the "final straw."

On the morning of September 30, 2011, Patsfield took a Breathalyzer test and urine test, the results of which were negative. There were never any follow-up tests.

Roesler formally terminated Plaintiff via e-mail on October 3, 2011. In the e-mail, Roesler wrote that he had given her several opportunities to provide the information she "claim[ed] to have had regarding a customer or driver complaint" and that her failure to do so prohibited Acme from being able to sufficiently investigate the claim. According to Roesler, Plaintiff showed "very poor judgment throughout this entire matter," with her "most recent refusal to provide information about a 'complaint' demonstrating [her] inability to consider the best interests of the company and [herself] as an employee of the company." The next day, Roesler completed a form in which he indicated that Plaintiff was terminated because she "made

several unsubstantiated accusations of the Penn South [Uniontown] Terminal Manager (Jim Patsfield). All were investigated and found to be untrue. This caused a disruption in business and was unproductive and unprofessional."

Roesler testified that his investigation of Plaintiff's allegation consisted of asking Patsfield whether he was out driving a truck on the date in question and requiring Patsfield to undertake a drug and alcohol test, the results of which were negative. Roesler never attempted to contact Baker Hughes to investigate the matter further, although he testified that he knew several employees there. Moreover, although Patsfield admitted to drinking during the day "pretty much the whole time" he worked at the Uniontown terminal, he denied having ever driven a truck while drinking. He also specifically denied having been drinking while picking up a load at Baker Hughes on the date of the alleged incident.

After receiving notice of her termination, Plaintiff sent Roesler an e-mail which reads as follows:

> I understand your decision. However, I asked you for a copy of the tape that you set on the table [at the September 26 meeting]. You would not furnish that. I do not understand why you would offer that in the meeting, then deny me a copy of that. Bottom line, it all played out like Dakota predicted? I have records of all of this. I did not come to Acme for controversy. If you sincerely think that 5 women worked at PennSouth, including myself, did anything controversial to Acme Truck Lines, I will beg to differ. However, Jimmy did tell me all about the Power's lawsuit. Why on earth would you not acknowledge reputable and dedicated people over what is going on in your PA office is beyond me.

## B.    Procedural History

Plaintiff initiated this action with the filing of a four-count Complaint on August 7, 2012. Count I alleges that Plaintiff was subjected to a hostile work environment; "demoted" after the September 26 meeting with Roesler and Patsfield; and eventually terminated because of her gender, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-

1 *et seq.* Count II alleges a Title VII retaliation claim, averring that Plaintiff was "demoted" and eventually terminated because she reported that Patsfield was allegedly sexually harassing her. Count III alleges hostile work environment, disparate treatment, and retaliation claims under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* Count IV alleges a state law wrongful discharge claim. On October 4, 2013, Acme filed this motion for summary judgment, seeking to dismiss all of Plaintiff's claims.

## II.    STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The nonmoving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Liberty Lobby*, 477 U.S. at 249). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the nonmoving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

## III.    DISCUSSION

### A.    Hostile Work Environment

Plaintiff first alleges that she was subjected to a hostile work environment as a result of

her gender. In order to state a hostile work environment claim, a plaintiff must establish that (1) she experienced severe or pervasive conduct, (2) because of her sex, (3) the conduct detrimentally affected her, (4) the conduct would have detrimentally affected a reasonable person under similar circumstances, and (5) the existence of *respondeat superior* liability. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). Acme contends that Plaintiff cannot establish that the alleged conduct was sufficiently severe or pervasive, and thus, it is entitled to judgment as a matter of law.

Allegedly harassing conduct is only actionable under Title VII if it is so severe or pervasive that it alters the terms and conditions of the plaintiff's employment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998). The Supreme Court has "always regarded [this] requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace – such as male-on-male horseplay or intersexual flirtation – for discriminatory 'conditions of employment.'" *Id.* Accordingly, "not every sexual comment, action or joke creates a hostile work environment." *Brown-Baumbach v. B&B Auto., Inc.*, 437 Fed. Appx. 129, 133 (3d Cir. 2011). That is, "[t]he mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability." *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001), *abrogated on other grounds as rec'd by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Whether the alleged conduct is actionable must be judged by the totality of the circumstances, with special emphasis placed on the following factors: the frequency of the conduct; its severity; whether it is physically threatening or humiliating; and whether it unreasonably interferes with the plaintiff's work performance. *Shaw v. Pittsburgh Bd. of Pub. Educ.*, No. 07–1183, 2009 WL 86709, at *6 (W.D. Pa. Jan. 12, 2009) (citation and quotation

marks omitted).

Plaintiff's hostile work environment claim is based in part on a series of allegedly inappropriate text messages she received from Patsfield between July and September 2011. In addition to the text messages, Plaintiff testified that she had several personal encounters with Patsfield during her short stint at Acme that she felt were sexually inappropriate. Specifically: he asked her to sit on his lap and hugged her. He called her "buttercup." He asked her on what she considered to be "dates" – a weekend trip to Penn's Cave; dinner with Sciullo and Patsfield's daughter; and an associate's birthday party – and she declined to go.[7] Plaintiff walked in on him while he was sleeping "completely exposed" on the recliner in the terminal. He "looked her up and down" and made comments about her clothing, which made her feel like he was looking through her clothes and which Patsfield admitted in his deposition may have been made in a sexual manner. He refused to take down the photograph of her which was used as his screensaver, even though the other employees in the terminal had agreed to do so. Finally, he became upset when she said that she was going to take a date to Acme's annual dinner, telling her that she better not do that.

Furthermore, Plaintiff alleges that over time "observing [Patsfield's] behavior" in the terminal made her fear for her safety. She testified that she feared him because of his size – over 400 pounds – and because he would spit in her face while speaking to her. Moreover, she claims

---

7.     Plaintiff testified that she felt Patsfield was asking her on a date when he invited her to take a trip to see Penn's Cave. The text conversation in which this invitation was made, however, started with Plaintiff asking, "What's up for the weekend?" Patsfield responded, "I want to see Penn Cave. Have you done that?" Plaintiff then responded, "Oh that would be cool, I want to see that. What about the flooding?" Moreover, the other alleged "dates" that Plaintiff was asked on were not going to be one-on-one meetings between Plaintiff and Patsfield, but involved other people from the terminal, as well. Viewing the facts in the light most favorable to Plaintiff, however, the Court will address Plaintiff's claim as if she was asked out on dates by Patsfield.

that on at least two occasions he yelled at her, cursed at her, and postured himself at her. She further claimed that Patsfield bragged to her "about carrying a gun and being a felon" and accused her of trying to take Acme's business for herself.

Having considered the collective force of all of these allegations, the Court finds that Patsfield's conduct was neither severe nor pervasive. First, the Court has reviewed the entire body of text messages exchanged between Plaintiff and Patsfield and concludes that, while some of them may have been inappropriate, they do not, taken together, bolster Plaintiff's claim. Although Patsfield did send texts that could be described as flirtatious – *e.g.* the references to Plaintiff as "buttercup," the references to Plaintiff's clothing, the statements that Patsfield was lonely in the terminal while Plaintiff was in New Orleans, and the crawfish comments – so too did Plaintiff. As just one example, on July 14, 2011, she sent a message referring to Patsfield as "silly guy." Other texts between the two evinced a similarly playful, friendly, and flirtatious tone. Moreover, it is questionable whether Plaintiff viewed the exchanges as harassing at the time, as she never indicated to Patsfield in any of their exchanges that she felt it was inappropriate for him to text her. In fact, she initiated several of the discussions herself and confided in Patsfield with fairly personal information regarding her family and daughter. *Compare Stevens v. St. Elizabeth Med. Cntr., Inc.*, 533 Fed. Appx. 624, 631 (6th Cir. 2013) (concluding that plaintiff failed to establish hostile work environment claim based on number of text messages exchanged between her and alleged harasser since the texts were not offensive and vulgar and plaintiff never indicated at the time that the texts were harassing) *with Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 394 (D. Md. 2010) (concluding that hostile work environment claim premised on repeated text messages could survive summary judgment since, *inter alia*, texts continued after plaintiff resisted her harasser's advances).

With respect to Plaintiff's other allegations, Patsfield's comments and actions may have been unwelcome and at times offensive, but his behavior on the whole was not particularly severe. *See, e.g., Shepherd v Comptroller of Pub. Accounts of Texas*, 168 F.3d 871, 872 (5th Cir. 1999) (holding that harasser's crass remarks about plaintiff, being touched on arm on several occasions and having shoulders rubbed, and being asked to sit on lap were not severe or pervasive). Granted, Plaintiff claims that Patsfield "exploded" at her, which caused her to fear for her safety, but she has not established any evidence tending to show that this outburst was based on her sex. To the contrary, the blowup resulted from a multitude of work-related issues that had been brewing throughout the terminal in mid-September, all unrelated to sex. *See, e.g., Penry v. Fed'l Home Loan Bank of Topeka*, 970 F. Supp. 833, 839 (D. Kan. 1997) (finding outburst during which plaintiff feared that supervisor would "come up out of the chair" at her was not actionable because plaintiff "made no showing that this outburst would not have occurred but for her sex"); *Roberts v. Unitrin Specialty Lines Ins. Co.*, No. 06-0380-B, 2008 WL 3832223, at *13 (N.D. Tex. Aug. 14, 2008) (concluding that "yelling matches involving cursing and even throwing papers at an employee do not constitute a hostile work environment if they are not because of her sex").

Plaintiff argues that Patsfield's alleged harassment was "constant and, to a large extent, inescapable as much of it was documented through text messages at all hours of the day." Pl.'s Resp. to Def.'s Mot. for Summ J. 26 (ECF No. 40). During her approximately three months working for Acme, however, Plaintiff only worked out of the Uniontown terminal about five times. It is not clear from either Plaintiff's brief or her deposition testimony how frequently the alleged incidents occurred. Thus, the Court cannot conclude that the cumulative effect of all of the incidents was enough to raise her claim above the threshold necessary to survive summary

judgment.  Nor has Plaintiff adduced any evidence beyond her own bald assertions that suggests that the alleged behavior actually affected her work environment.  *See Garzouzi v. Nw. Human Servs. of Penn.*, 225 F. Supp. 2d 514, 537 (E.D. Pa. 2002) (finding "bare assertions, without any elaboration on how [plaintiff's] job was made impossible and miserable or of how the working conditions were made unhealthy and without any substantiation, insufficient to show that [plaintiff] was detrimentally affected").  In fact, she testified that Patsfield's alleged conduct did not affect her job performance:

> Q: But the point is, you were able to get your job done very well really the entire period you were at Acme Truck Line; do you agree with that?
>
> A: Absolutely.

In summary, considering Patsfield's alleged boorish behavior after the relationship with Plaintiff soured together with his previous flirtatiousness, the Court finds that the evidence fails to establish that Patsfield's conduct was severe or pervasive enough to have created a hostile work environment.  Plaintiff's short time at Acme was filled with workplace drama. Nevertheless, "an acrimonious work environment is not a basis for relief under Title VII." *Ellison v. BHBC Nw. Psych. Hosp.*, No. 11–5106, 2013 WL 1482199, at *12 (E.D. Pa. Apr. 9, 2013).  Acme is, therefore, entitled to summary judgment on Plaintiff's hostile work environment claim under Title VII.

### B.  Disparate Treatment

Plaintiff also claims in Count I that she was "demoted" after the September 26 meeting and then eventually terminated because of her gender.  Under the *McDonnell Douglas* burden-shifting framework, which applies to both Title VII and PHRA claims, the plaintiff bears the initial burden of establishing a *prima facie* case of sex discrimination, which requires her to show that: (1) she is a member of a protected class; (2) she was qualified for her former position; (3)

she suffered an adverse employment action; and (4) the circumstances give rise to an inference of unlawful discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If the plaintiff establishes a *prima facie* case, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decisions. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual" – *i.e.* that the employer's stated reason was false and that discrimination was the real reason for the challenged actions. *Id.* Acme contends that Plaintiff's claim is faulty because she cannot establish a *prima facie* case with respect to either her demotion or termination and because there is no evidence of pretext.

The Court will address each of these arguments in turn. Moreover, each alleged adverse action – the alleged "demotion" and termination – will be analyzed separately for the sake of clarity. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (explaining that discrete actions such as demotion and termination are individually actionable as "separate actionable unlawful employment practice[s]") (citation omitted).

### 1. Plaintiff's *Prima Facie* Case

#### a. Alleged "Demotion"

Acme contends that Plaintiff's alleged "demotion" after the September 26 meeting with Roesler and Patsfield was not an "adverse employment action" and thus this portion of Plaintiff's claim must fail. The Court agrees.

An "adverse employment action" is one that is "'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Cardenas v.*

*Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). Conversely, the United States Court of Appeals for the Third Circuit has explained that "[m]inor actions, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions." *Langley v. Merck & Co., Inc.*, 186 Fed. Appx. 258, 260 (3d Cir. 2006) (citations omitted).

Here, most of Plaintiff's allegations are akin to those in *Langley*. Requiring Patsfield to report directly to Roesler instead of to Plaintiff and requesting that Plaintiff file a weekly itinerary were not serious enough to alter the conditions of her employment. These were changes to the organizational structure designed to benefit Plaintiff and the terminal, generally, by providing more structure to the terminal's operating procedure, which had clearly been failing in the lead up to the meeting.

A more difficult question is raised by Roesler's decision to prohibit Plaintiff from communicating with terminals once she brought them on board with Acme. Plaintiff maintains that staying in contact with terminals was an essential part of her job. Pl.'s Resp. to Def.'s Mot for Summ. J. 37-39 (ECF No. 40). As she testified in her deposition, by eliminating her ability to deal one-on-one with terminals,

> . . . they were choking me off from my job. My job is communicating with these offices. That's how I make my living. If [the offices] have a problem, I fix it for them. I have done it all these years. So in this [e-mail] . . . [Roesler] says I do sales work for Penn South, and after I sign on an agent, I am done with it. That's not how this business works. So he was crippling me to proceed.

The upshot, according to Plaintiff, would be fewer opportunities to develop business and earn bonuses. Roesler, however, testified that Plaintiff's bonus plan did not change as a result of the shift in her responsibilities. Although this dispute would appear to create a fact issue for a jury to resolve, Plaintiff cannot survive summary judgment simply by "testifying as to her beliefs

concerning the relevant facts" – *i.e.*, how her pay would be affected – "without showing her beliefs are based on either personal knowledge or some other evidence." *Langley*, 186 Fed. Appx. at 260 n.1. Because Plaintiff has not provided the Court with a copy of her bonus plan or otherwise sufficiently explained how she was compensated and how the change in her job duties would affect her ability to earn bonuses, the Court finds that Plaintiff has adduced insufficient evidence from which a reasonable factfinder could conclude that her new role was inferior to her old role. Thus, the changes in her employment after the September 26 meeting do not amount to an "adverse employment action," and Acme's motion for summary judgment will granted as to this aspect of Plaintiff's claim.

### b. Termination

Acme has not challenged Plaintiff's evidence regarding the first three elements of Plaintiff's claim for discriminatory discharge/termination. Acme does, however, contest the fourth prong, arguing that Plaintiff cannot identify any similarly situated male Acme employees who "refused to provide information to a supervisor in an investigation into employee conduct after it was requested on multiple occasions" who were not discharged. Def.'s Br. in Supp. of Mot. for Summ. J. 47 (ECF No. 30).

The Court does not agree with Acme's argument that Plaintiff *must* identify similarly situated employees who were treated more favorably than her in order to establish a *prima facie* case. *See Thompson v. Tractor Supply Co.*, No. 10–234, 2011 WL 4433268, at *8 (W.D. Pa. Sept. 21, 2011). Our appellate court has explained that although introducing comparator evidence is one way to establish a *prima facie* case, it is far from the only way. *See Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 939 (3d Cir. 1997); *Sarullo*, 352 F.3d at 797 n.7. Instead, "the elements of a *prima facie* case depend on the facts of the particular case."

*Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999). Courts have consistently emphasized that the forth prong should not be applied mechanically or rigidly because the plaintiff's burden at this stage "is not onerous." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The plaintiff must simply adduce enough facts to allow a jury to infer that her termination was the result of discrimination.

This case is a close call. On the one hand, it is undisputed that the mostly male employees at the Uniontown terminal were generally left to their own devices by Acme's corporate brass – drinking in the terminal, falsifying logs, keeping the place in a state of disarray. All of that conduct apparently went undisciplined. Yet, Plaintiff was terminated after just one alleged disciplinary infraction. Moreover, the evidence suggests that Roesler was angling for a way to remove Plaintiff from the company and seized on her allegation regarding Patsfield as an opportunity to do so. On the other hand, there is not a scintilla of evidence that Roesler was motivated to terminate Plaintiff because of her gender. Roesler's investigation of Plaintiff's allegation does not appear to have been very thorough – he surely could have called Baker Hughes to find out on his own if someone had seen Patsfield drinking. But a shoddy investigation is only sufficient to create an inference of discrimination if it is conducted against a backdrop suggesting gender-based animus. *See Taylor v. Procter & Gamble Dover Wipes*, 184 F. Supp. 2d 402, 416 (D. Del. 2002). While there was definitely growing personal animosity between Roesler and Plaintiff, that alone "does not raise an inference of discrimination." *Vasbinder v. Shinseki*, No. 09–1239, 2011 WL 1789989, at *7 (W.D. Pa. May 10, 2011) (citing *Baker v. City of Philadelphia*, 405 Fed. Appx. 599 (3d Cir. 2010)).

Furthermore, Plaintiff makes repeated references to alleged discriminatory treatment toward other female employees, both before and after her period of employment with Acme.

While the Court recognizes that a history of sex-based animus on Acme's part could help to establish an inference of discrimination, *see Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 111 (3d Cir. 1999), Plaintiff's general allegations about the treatment that these women allegedly received are not supported by facts in the record.[8] She has not offered the deposition testimony of these women, affidavits by them, or testimony of anyone else describing the circumstances under which they left their employment with Acme. She is merely insinuating that because they left or were removed from their jobs, they must have been discriminated against. The Court is unwilling to entertain such speculation.

On balance, the Court concludes that the facts, even viewed in the light most favorable to Plaintiff, do not give rise to an inference that Plaintiff's gender was the but-for cause of her termination. Accordingly, she cannot establish a *prima facie* case of gender discrimination.

## 2. Pretext

Acme argues that even if Plaintiff could establish a *prima facie* case, it is still entitled to summary judgment because Plaintiff cannot show that its reason for discharging her was a pretext for discrimination. A plaintiff can establish pretext by "point[ing] to some evidence,

---

8.  Plaintiff submits that Martz complained that Patsfield sexually harassed her and soon thereafter was terminated. Martz's letter to Roesler, however, did not indicate that she was being harassed. It focused only on the disgusting conditions in the terminal and Patsfield's boorish behavior towards her. While her subsequent e-mail did reference a "hostile work environment," the context of the e-mail suggests that she was not using that term in the legal sense, but instead to describe the altercations and arguments in which she had been involved after becoming employed with Acme. In any event, Martz dispelled any remaining doubt as to whether she felt that she was sexually harassed by Patsfield in her sworn declaration. *See* Def.'s CSMF, Ex. E at 1 (ECF No. 31).

   Plaintiff also provided the Court with an e-mail sent to Coatney by a woman named Desirae Leonard, who started working for Acme after Plaintiff had been terminated. In the e-mail, Leonard states that she was forced to quit her job because of Patsfield's behavior and references other women who had apparently complained about Patsfield, as well. The lack of specificity regarding the circumstances of Leonard's departure, however, diminishes any probative value this e-mail may have. *See Sarantis v. ADP, Inc.*, No. 06-2153, 2008 WL 4057007, at *2 (D. Ariz. Aug. 28, 2008).

direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. It is not enough for a plaintiff to complain that "the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. Instead, the plaintiff must point out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (emphasis in original).

In this case, Acme contends that it terminated Plaintiff for failing to reveal the name of the individual at Baker Hughes who told her that he saw Patsfield drinking on the job. This clearly constitutes a legitimate, non-discriminatory reason. As previously explained, however, Plaintiff has created some doubts about whether her refusal to provide the information actually drove Roesler's decision. It does seem as if Roesler wanted to terminate Plaintiff even before she made her allegation against Patsfield on September 29.

Nevertheless, Plaintiff must "demonstrate that [Acme's] reasons were a pretext for *discrimination*, not a pretext for something else." *Vasbinder*, 2011 WL 1789989, at *8 (quotation omitted). To be sure, "a plaintiff's [circumstantial] *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false" may be enough for her to meet this burden. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). However, "*Reeves* does not require [the Court] to send every discrimination case where there is evidence of pretext to the jury." *Aufdencamp v. Irene Stacy Cmty. Mental Health Cntr.*, 234 F.

Supp. 2d 515, 517-18 (W.D. Pa. 2002); *accord Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000). As the Supreme Court recognized in *Reeves*,

> Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148 (citations omitted).[9]

This is one such case. Even though Plaintiff has created some doubts about Acme's stated legitimate, non-discriminatory reason, the Court finds that a reasonable factfinder could not find that the unstated reason for Acme's actions was Plaintiff's gender. Plaintiff has offered nothing beyond speculation and innuendo in support of her claim. Acme is therefore entitled to summary judgment on Plaintiff's Title VII gender discrimination claim regarding her termination.

## C. Retaliation

In Count II, Plaintiff alleges that she was "demoted" and then terminated for complaining about sexual harassment. Title VII makes it unlawful

> for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3(a).

---

9. While *Reeves* involved a Rule 50 motion for judgment as a matter of law filed after a jury had returned a verdict for the plaintiff, the Supreme Court's rationale applies equally at the summary judgment stage. *See Reeves*, 530 U.S. at 150 (explaining that "the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same) (citations and quotation marks omitted).

Retaliation claims are governed by the familiar *McDonnell Douglas* burden-shifting approach set forth above. To establish a *prima facie* case, a plaintiff must prove by a preponderance of the evidence that: (1) she engaged in a protected activity, (2) her employer took an "adverse employment action" against her, and (3) there is a causal link between her protected activity and the adverse action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006) (citing *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). Acme concedes that Plaintiff complained of sexual harassment but contends that it is nonetheless entitled to summary judgment because (1) Plaintiff's alleged "demotion" was not an "adverse employment action;" and (2) Plaintiff cannot establish a causal link between her complaint and the decision to terminate her. These arguments will be addressed *seriatim*.

### 1. Alleged "Demotion"

The Court agrees that the changes instituted by Roesler after the September 26 meeting do not constitute an actionable "adverse employment action." Granted, the "standard a plaintiff must meet in establishing a materially adverse action is widely recognized to be lower for a retaliation claim than for a disparate treatment claim." *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 426 (D.N.J. 2009) (citation omitted). A plaintiff need not show that she suffered a tangible employment action, but instead need only show that her employer's actions might dissuade a reasonable worker from engaging in conduct protected by Title VII in the future. *Burlington*, 548 U.S. at 70-71 (2006). Nevertheless, the same facts that led the Court to conclude that Plaintiff's "demotion" did not satisfy the "adverse action" element of her disparate treatment claim lead it to the same conclusion with respect to her retaliation claim. Therefore, Acme is entitled to summary judgment on Plaintiff's retaliation claim as it relates to her "demotion."

## 2. Termination

Next, Acme argues that Plaintiff cannot establish a *prima facie* case because there is no evidence of causation. The Court will assume for the purpose of this motion that Plaintiff can establish a *prima facie* case, and focus instead on the pretext analysis. The analysis of Acme's legitimate non-discriminatory reason and Plaintiff's showing of pretext for retaliation are the same as they were for her disparate treatment claim. Accordingly, for the same reasons set forth previously, the Court concludes that Plaintiff cannot establish pretext. She has adduced no evidence that suggests that her complaint of alleged harassment factored into the decision to terminate her. The motion for summary judgment will be granted as it relates to Plaintiff's Title VII retaliation claim.

## D. Remaining State Law Claims

Having found that Plaintiff is unable to sustain her Title VII claims against Acme, only her state law claims for violation of the PHRA and wrongful discharge remain. 28 U.S.C. § 1367(c) provides that a district court may, in its discretion, decline to exercise jurisdiction if, *inter alia*, the claim raises a novel or complex issue of state law or the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(1)-(3). In this case, Plaintiff's wrongful discharge claim involves a novel issue of state law, as the Pennsylvania courts have not heretofore recognized a viable exception to the at-will employment doctrine under the circumstances raised in Plaintiff's complaint. Moreover, as previously explained, summary judgment will be granted to Defendant on all of Plaintiff's federal claims. Accordingly, the Court will decline to exercise supplemental jurisdiction over Plaintiff's PHRA and wrongful discharge claims, and such claims will be dismissed without prejudice to her ability to refile in an appropriate Pennsylvania court.

Accordingly, those claims will be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT will be **GRANTED**.  Furthermore, the Court will decline to exercise supplemental jurisdiction over Plaintiff's pendent state law claims in Counts III and IV.  Those claims will be dismissed without prejudice.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

REBECCA CARROLL,　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　Plaintiff,　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )　2:12-cv-1114
　　　　　　　　　v.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　 )
ACME TRUCK LINE, INC.,　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　Defendant.　　　　　　)

## ORDER OF COURT

**AND NOW**, this 21st day of January, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** as follows:

1.　DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 29) is **GRANTED** as to all of Plaintiff's Title VII claims alleged in her Complaint;

2.　The pendent state law claims against Defendant in Counts III and IV are **DISMISSED** without prejudice; and

3.　The Clerk shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc:　**Vicki Kuftic Horne, Esquire**
　　　Email: vkhorne@vkhorne.com
　　　**Nicole Amato, Esquire**
　　　Email: namato@vkhorne.com

　　　**Melissa L. Evans, Esquire**
　　　Email: melissa.evans@jacksonlewis.com
　　　**David K. Theard, Esquire**
　　　Email: dtheard@joneswalker.com

**Jane H. Heidingsfelder, Esquire**
Email: jheidingsfelder@joneswalker.com
**Thomas P. Hubert, Esquire**
Email: thubert@joneswalker.com